IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Lexington County School District One,       )
                                            )       C.A. No. 3:10-01808-MBS
                        Plaintiff,          )
                                            )
                vs.                         )
                                            )       **ORDER AND OPINION**
Janet B. Frazier, on behalf of her son, D.T.,  )
                                            )
                        Defendant.          )
_____)

In this action, Plaintiff Lexington County School District One ("the District") challenges the determination of the State Review Officer ("SRO") that student D.T. was not provided a free appropriate public education ("FAPE") from 2007-2008 as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq. (2005). The District also challenges the determination that Defendant Janet B. Frazier is entitled to reimbursement for D.T.'s private placement during that year. Defendant filed a counterclaim challenging the determination of the SRO that D.T. was provided with a FAPE by Plaintiff and thus was not entitled to private placement reimbursement during the 2008-2010 school years. Further, Defendant requests a judgment entitling her to reimbursement for any future tuition paid to D.T.'s current private placement, for as long as it remains his educational placement under the IDEA. The parties have filed cross-motions for judgment on the administrative record.[1]

---

1 This opinion references the official administrative record, designated by a citation to A.R.

# BACKGROUND

### 1999-2006 School Years

D.T. was first identified as being eligible for special education services in 1999 when he was in second grade in Lexington County School District One in Lexington, South Carolina. A.R. 0158, ECF No. 29-3. In September 2002, D.T. enrolled in the Fort Mill School District Four ("Fort Mill"), now York County School District Four, in Fort Mill, South Carolina. A.R. 0158-0159, ECF No. 29-3. Upon the recommendation of a counselor at Fort Mill, Defendant, D.T.'s mother, had D.T. evaluated by the Department of Neuropsychiatry and Behavioral Science at the University of South Carolina School Of Medicine in February 2004. A.R. 0836, ECF No. 29-13. D.T. was examined and observed on three separate occasions by the evaluators, who diagnosed him with Asperger's Disorder, Disorder of Written Expression, and Learning Disorder, among other things. A.R. 0838-0840, 0844, ECF No. 29-13. The report indicated that D.T.'s life changes, including his father's death, the move to Columbia, South Carolina, and his mother's new marriage, exacerbated D.T.'s anxiety symptoms. A.R. 0860, 0868, ECF No. 29-13, 14. In 2006, Carolinas Rehabilitation Center evaluated D.T. and confirmed that the "clinic interview with patient, in addition to neuropsychological testing, are extremely consistent with Asperger's Disorder." A.R.0852, ECF No. 29-13. Various psychological professionals subsequently confirmed this diagnosis, stating that behaviors attributable to the disorder include anxiety, depression, lack of eye contact, difficulty reading and writing, and feeling socially overwhelmed, many of which behaviors D.T. exhibited. A.R. 0845, 0856-0859, 0863, ECF No. 29-13, 14. At Fort Mill, D.T. would often "shut down" at school or refuse to participate in class. A.R. 0611, ECF No. 29-9. Eventually, D.T. refused to attend school altogether. A.R. 0159, ECF No. 29-3. Defendant then secured counseling services to help

address D.T.'s unwillingness to return to school. She could not maintain the services for long due to cost. In January 2007, Fort Mill developed a new IEP that provided counseling services as a "related service" five periods per week and listed counseling as an intervention strategy for behavioral issues. A.R. 0623, 0632, ECF No. 29-9. D.T. often refused to attend school toward the end of his time at Fort Mill, despite the counseling. A.R. 1010, 1021, ECF No. 29-16.

***Spring 2007 School Year***

In February 2007, Defendant relocated to Lexington County and prepared to enroll D.T. at Lexington High School, which is part of Lexington School District One. A.R. 1058, 0161, ECF No. 29-18. The District's IEP team met on February 28, 2007 to develop an IEP. A.R. 0628-0631, ECF No. 29-9. Fort Mill participated in the conversation and informed the District of D.T.'s attendance issues as well as the fact that he had been provided with counseling services. A.R. 0630, ECF No. 29-9. However, the District did not include attendance issues in the new IEP nor did it continue the counseling services that had begun at Fort Mill. A.R. 0163-0166, ECF No. 29-3. The District explained that it discontinued counseling services because the services had not previously solved the attendance problem at Fort Mill. The District chose instead to focus its IEP on the school setting itself. Pl.'s Mot. J. A.R. 5, ECF No. 24-1.

On March 6, 2007, D.T. began attending Lexington High School in regular block scheduled classes with a resource room class designed especially for students with learning and other disabilities. A.R. 0166, ECF No. 29-3. D.T. attended school for the first few days, after which he refused to attend regularly despite Defendant's efforts to compel D.T. to attend. A.R. 0167, ECF No. 29-3. Based on D.T.'s resistance to attending school, the District made modifications to his class schedule, provided a personal assistant for a short time, changed the transportation method as

3

requested by D.T., and visited D.T. at home numerous times as part of its truancy intervention plan. A.R. 0416-0418, ECF No. 29-6.  The truancy plan did not include a psychological evaluation of D.T. or counseling to determine why he was reluctant to return to school and what could be done to change that.  A.R. 0971, ECF No. 29-16.  D.T. consecutively missed twenty-nine of fifty-two days of school in the spring of 2007.  A.R. 0987, ECF No. 29-16.

***2007-2008 School Year***

On May 17, 2007, the District's IEP Team created a new IEP for the 2007-2008 school year. The plan included strategies to address D.T.'s refusal to participate in the classroom, such as a Behavior Intervention Plan as well as a course at the District's Technology Center. A.R. 0523, 0525, 0638, ECF No. 29-7, 29-9.  The IEP goal was for D.T. to improve his behavior by verbalizing frustration rather than shutting down seventy percent of the time.  A.R. 0187, ECF No. 29-3.  The plan did not include among issues to address, counseling as a related service or absenteeism.  A.R. 1038, ECF No. 29-17.  Defendant's attempts at persuading D.T. to attend the District's summer program failed.  A.R. 0192-0193, ECF No. 29-3.  In August 2007, D.T. attended the first few days at Lexington High School but subsequently refused to return.  A.R. 0299-0301, ECF No. 29-4.

There were a few accounts from school officials that D.T. was often cheerful and helpful during the first few days of school.  However, the District's administrator, Mr. Rollins, testified that in the few days that D.T. attended school, he was not participating in class like he should have been and was withdrawn. A.R. 0430, ECF No. 29-6.  D.T.'s teacher, Ms. Dowdy, stated that although D.T. was in good spirits and helpful the first day she saw him, shortly after, he became quiet if she requested something from him; then he started putting his head down in class, after which he stopped attending school altogether.  D.T. also was unresponsive to the homebound instructor, Ms.

4

Pooley. A.R. 0420-0421, ECF No. 29-6. Defendant tried to encourage D.T. to attend school by taking away D.T.'s games, but this strategy was not successful and led to D.T. not eating or bathing for numerous days.

Four more IEP meetings were held that fall, where the team addressed D.T.'s absenteeism through truancy plans that included home visits by team members. A.R. 1038-1041, ECF No. 29-17. At each subsequent IEP meeting, Defendant requested that counseling services be provided to D.T. to address the reasons why he refused to attend school. A.R. 0208, 0226-0228, ECF. No. 29-3. However, the District's IEP consistently marked counseling as "Not Applicable." A.R. 0689, 0716, 0744, 0748, ECF No. 29-10, 11. Defendant made various efforts on her own to procure therapy for D.T. from the Department of Mental Health, but failed. A.R. 0227-0228, ECF No. 29-3.

Various school officials visited D.T. at home to encourage him to return to school but their efforts failed. The District's Autism Team, which included Autism specialist Alicia Carey, met with D.T. on two occasions to observe his behavior and to persuade him to return to school. A.R. 0462, 0474, ECF No. 29-7. Carey questioned D.T.'s prior psychological evaluations and whether D.T. was on the Autism Spectrum at all. A.R. 0507-0508, ECF No. 29-7. Carey opined that D.T.'s refusal to attend school was not related to Asperger's Disorder, but was a learned behavior due to his access to preferred items at home, such as video games. A.R. 0482-0483, ECF. No. 29-7. Carey noted that D.T. appeared to have some depression issues and recommended to the IEP team that he be evaluated for depression as well as to determine where he fell on the Autism Spectrum. A.R. 0476, ECF No. 29-7. It appears that none of Carey's recommendations was implemented. A.R. 0488, ECF No. 29-7.

In September 2007, D.T. was evaluated by Dr. David Downie, a psychiatrist, who observed that D.T. was unresponsive, often refusing to look up and burying his head when asked about school. Further, D.T. explained to Dr. Downie that school was hard, work was difficult, and that he got frustrated easily at school. A.R. 0868, ECF No. 29-14.  After evaluating D.T., Dr. Downie stated that a residential program that would address D.T.'s academic, interpersonal, and social needs should be strongly considered.  A.R. 0869, ECF No. 29-14.  On September 17, 2007, Defendant made a request to the District that she be able to place D.T. at Montcalm School ("Montcalm").  Montcalm is a private residential education facility located in Michigan, designed to create a therapeutic environment for special needs students.  Defendant believed that D.T.'s placement at Montcalm would jointly address his mental health and educational needs.  A.R. 0835, ECF No. 29-13.  The District denied the request, arguing that it could provide an appropriate program at Lexington High School for D.T.  Id.  On November 27, 2007, the IEP team met to discuss D.T. and the District again denied Defendant's request for therapy for D.T.  A.R. 0715, ECF No. 29-11.  On December 6, 2007, Defendant had a psychiatric evaluation performed on D.T. by Dr. Schnackenberg, who issued a report that recommended a therapeutic residential placement with daily counseling to address the "behaviors and manifestations of [D.T.'s] disability . . . ." A.R. 0995, ECF No. 29-16.

On December 13, 2007, Defendant informed the District of her intent to remove D.T. from Lexington High School and enroll him at Montcalm.  A.R. 0994, ECF No. 29-16.  At the December 18, 2007 IEP meeting, the District agreed to evaluate D.T.  A.R. 0747, ECF No. 29-11.  Defendant indicated her intention to move D.T. to Montcalm by January 5, 2008.  The District stated that it could not provide for an evaluation prior to that date.  A.R. 0747-0748, ECF No. 29-11.  Defendant enrolled D.T. at Montcalm in January 2008.  A.R. 0244-0245, ECF No. 29-3.  Montcalm offers a full

curriculum of courses to meet graduation requirements.  Teachers participate in special education trainings and therapy so treatment can take place during the day through individualized plans for each student.  A.R. 0038, ECF No. 29-1.  The class size is ten to twelve students and the classes are fifty minutes in length.  A.R. 0039, ECF No. 29-1.  The school also provides social skills training, and a therapist is available on an as-needed basis.  A.R. 0039-0049, ECF No. 29-1.  Montcalm holds group therapy sessions daily and weekly family sessions via telephone.  A.R. 0112, ECF No. 29-2.

Ms. Hiatt, Dean of Students at Montcalm and certified in special education, testified that just prior to D.T. arriving at Montcalm in January 2008, he was unresponsive to a point where he was not communicating very much at all. Ms. Hiatt evaluated D.T. when he first arrived at Montcalm.  She determined that D.T.'s unresponsiveness was related to his disability because he felt like people did not understand his disability. A.R. 0050, ECF No. 29-1.  D.T. communicated to her that he often felt alone, frustrated, and ostracized at Lexington High School because of his disability and as a result did want to continue attending school there.  A.R. 0052-0053, ECF No. 29-1.  Further, D.T. explained that he would often feel anxious and overwhelmed by the large class sizes of eighteen to twenty students at Lexington High School. Id.  D.T. refused to attend classes at Montcalm on three separate occasions.  After therapy and other interventions, D.T. resumed his attendance.  A.R. 0146-0148. ECF No. 29-2.  Once at Montcalm, D.T. was put in a therapeutic educational program where he improved academically.  In fact, D.T. improved almost two grade levels in both Math and Reading while he was there. A.R. 0055-0056, ECF No. 29-1. By all parties' contentions, D.T.'s condition greatly improved while at Montcalm, and he made significant progress academically. A.R. 0021, 0956, ECF No. 29-1, 16.

*2008-2009 School Year*

On August 28, 2008, the District held an IEP meeting to discuss a proposed placement for D.T. for the 2008-2009 school year.  A.R. 0778-0803, ECF No. 29-12.  The IEP team received input from Montcalm staff and Defendant, who provided recommendations for components that were successful for D.T. at Montcalm. A.R. 0057-0058, ECF No. 29-1.  Montcalm recommended classes that would allow for stress relief, small student-teacher ratios of ten to twelve students, individualized instruction, classes with other Asperger's and High Functioning Autistic students, and classes that were 50 minutes or less in duration.  A.R. 0062, 0065, ECF No. 29-1.  Montcalm warned against the implementation of virtual classes, on the basis that D.T. would regress socially and mentally in the absence of consistent social interaction with peers and teachers. A.R. No. 0058, 0064, ECF No. 29-1.

The District's final IEP included a preferred activity in the beginning of the day that could offer stress relief, such as weight-lifting, music lessons, and driving lessons.  A.R. 0567, ECF No. 29-8.  The District also created an individualized learning program for D.T., which included virtual classes and a curricular in-person class with fourteen students.  A.R. No. 0568-0570, ECF No. 29-8. Finally, the IEP team formally proposed to have an outside agency conduct an evaluation of D.T. and determine whether counseling may be appropriate.  A.R. 0802, 0827, ECF No. 29-13.  At the close of the meeting, Defendant requested that the IEP team consider placing D.T. at Glenforest School, a private institution in Columbia, South Carolina, for the 2008-2009 school year.  The team denied the request.  A.R. 0802, 0827, ECF No. 29-12, 13.  On August 29, 2008, Defendant notified the District of her intent to place D.T. at Glenforest School starting September 8, 2008.  A.R. 0994, ECF No. 29-16.

8

*2009-2010 School Year*

The District held another IEP meeting in preparation for the 2009-2010 school year, by which time Defendant had already paid D.T.'s tuition at Glenforest School for the school year. A.R. 0268, 0804, 0892, ECF No. 29-4, 12, 14. The IEP was substantially similar to the IEP developed the year prior. Def.'s Mot. J. A.R. 13, ECF No. 23-1. D.T. attended Glenforest School in 2009-2010 and has not returned to Lexington High School. Def.'s Mot. J. A.R. 14, ECF No. 23-1.

## PROCEDURAL HISTORY

Defendant initiated an administrative action on October 21, 2009, alleging that the District denied a FAPE to D.T. as required by the IDEA and seeking to recover reimbursement for all costs associated with D.T.'s placements at Montcalm and Glenforest School. After a two-day hearing, the Local Hearing Officer ("LHO") issued a decision on February 15, 2010, denying the request for reimbursement, and finding that the District had provided a FAPE to D.T. at all relevant times.

The LHO found that the IEP was adequate and that it was not the District's responsibility to address D.T.'s attendance problem. The LHO stated that D.T.'s truancy was not related to his disability but was a product of Defendant's inability to discipline D.T. A.R. 1017, ECF No. 29-17. The LHO stated that Defendant relented if D.T. resisted too much and that he would wait her out and eventually she would leave him alone. Id. Further, the LHO attributed D.T.'s success at Montcalm to the 24/7 control it had over D.T.'s life, whereas at home, Defendant gave D.T. access to video games, which he preferred over attending school. A.R. 1017-1018, ECF No. 29-17. Finally, the LHO stated that it was a parent's responsibility to ensure her child's attendance and that D.T.'s failure to attend Lexington High School was not related to his disability but reflective of his ability to manipulate his mother. A.R. 1018, ECF No. 29-17. Finding that the District fulfilled its

9

obligations under the IDEA, the LHO held that the 2007-2008 IEP was adequate and that Defendant was not entitled to reimbursement for that school year.

Defendant appealed the LHO's decision to the State Review Officer, ("SRO"). In an order dated April 13, 2010, the SRO reversed the LHO in part, finding that the District denied D.T. a FAPE during the 2007-2008 school year. According to the SRO, the District inherited a challenging situation in early 2007; D.T. had been struggling at a previous school district, as demonstrated by his poor attendance toward the end of his time at Fort Mill. Further, he was struggling with his father's death, his mother's remarriage and the transition to a new home and new school. A.R. 1057, ECF No. 29-18. Even the District's own special education director, Robin Simmons, explained that she was concerned about what D.T.'s educational experience at Lexington High School would be like because children under the Autism Spectrum often have a very difficult time when they experience change. A.R. 0394, ECF No. 29-5. The SRO noted that despite the District's awareness of D.T.'s attendance and transition problems, it did not set a goal relating to either problem and did not include any type of evaluation or counseling in the IEP to address D.T.'s reluctance to attend school. The IEP did not include any "related services," such as psychological counseling, that would have allowed D.T. to benefit from special education. See 20 U.S.C. §1401(17).

The SRO stated that even if the original IEP did not include counseling, the District should have amended the IEP and offered evaluations or counseling once D.T. refused to return to school. A.R.1057, ECF No. 29-28. Based on the District's observations and D.T.'s unwillingness to return to school after less than a week of classes, the SRO found that the current IEP was not reasonably calculated to confer some educational benefit. In order to be adequate, the SRO determined that the

IEP should have included psychological counseling or at least an evaluation to determine why D.T. was so resistant to school.

The SRO, however, affirmed the LHO's determination that D.T. was provided with a FAPE by the District in 2008-2009 and 2009-2010 and thus denied tuition reimbursement for Glenforest School. Both the LHO and SRO found that the District's IEPs for the 2008-2009 school year and subsequent years were adequate and provided a FAPE to D.T.

On July 10, 2010, the District filed this action, requesting that this court reverse the SRO in part and find that the District offered a FAPE to D.T. during the 2007-2008 school year. Defendant argues that the IEPs designed by the District since 2008 did not provide a FAPE to D.T. because of the District's inclusion of virtual school in D.T.'s schedule when Montcalm advised the District that this could cause regression in D.T.'s developing social skills. Furthermore, Defendant argues that the 2008-2009 IEP included class periods that were much longer than the 50 minutes recommended by Montcalm. Defendant requests that the court grant an order reimbursing her for tuition paid to Glenforest School from 2008 until the present and for future tuition paid until D.T.'s graduation.

## DISCUSSION

### I. Standard of Review

In South Carolina, the administrative proceedings are two-tiered because a hearing first is conducted before an LHO and then is appealable to an SRO. S.C. Code Ann. Regs. 43-243, § V. 14(b)(2). An SRO is obligated under the IDEA to review the record and make an independent decision based on his or her view of the preponderance of the evidence, while giving due weight to the findings of fact of the LHO. Sumter County Sch. Dist. v. Heffernan, 642 F.3d 478, 485 (4th Cir. 2011). Any party aggrieved by the findings and decision of the SRO may then bring suit in state or

federal court. S.C. Code Ann. Regs. 43-243, §V. 14(b)(2). The IDEA permits an aggrieved party to file an action in federal court challenging the decision rendered in the state administrative proceeding. 20 U.S.C. § 1415(i)(2)(A). In any action brought under this paragraph, the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B). The parties in this case have chosen not to supplement the administrative record and have filed cross motions for judgment on the administrative record, as permitted by the IDEA. Id.

In a judicial proceeding under the IDEA, a reviewing court is required to give "due weight" to the underlying administrative proceedings. Bd. of Educ. v. Rowley, 458 U.S. 176, 208 (1982). Under this modified de novo standard, reviewing courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings. Doyle v. Arlington County Sch. Bd., 953 F.2d 100, 103 (4th Cir. 1992). According to the Fourth Circuit, due weight is understood to mean that findings of fact by administrative hearing officers in IDEA cases are entitled to be considered prima facie correct if "regularly made" within accepted fact-finding norms. Id.

When an LHO or SRO has deviated so far from the accepted norms of a fact-finding process that his findings are not considered to have been regularly made, his decision is not entitled to deference by a reviewing court. Heffernan, 642 F.3d at 485. For example, if an SRO improperly rejects regularly made credibility findings by the LHO, the SRO's decision is not entitled to deference by the district court. Doyle, 953 F.3d at 105. However, when the findings of fact are regularly made by the LHO or SRO, each is entitled to deference by the district court. Heffernan,

12

642 F.3d at 485. If the district court does not follow the findings of one or either administrative officer, it is required to explain why it does not. Doyle, 953 F.3d at 104-05. In a two-tier administrative review process where the LHO and SRO have reached the same conclusion, the district court is obliged to accord greater deference to their findings. Combs v. Sch. Bd., 15 F.3d 357, 361 (4th Cir. 1994). When the LHO and SRO reach different conclusions, the district court should give due weight to the regularly made findings of both officers. Heffernan, 642 F.3d at 485. After giving the administrative findings the appropriate due weight, if any, the district court is free to decide the case on the preponderance of the evidence, as required by statute. Doyle, 953 F.3d at 105.

## II. Analysis

### A. *Reimbursement for Montcalm Placement; 2007-2008*

#### 1. IEP and FAPE

The District contends that the SRO erred in granting Defendant reimbursement for D.T.'s placement at Montcalm during the 2007-2008 school year. The District requests this court to affirm the LHO's finding that Defendant is not entitled to reimbursement, because the District's IEP for 2007-2008 was adequate and provided D.T. with a FAPE for that school year. The court disagrees with the District.

The IDEA requires states receiving federal funds for education to provide a FAPE for children with a disability. 20 U.S.C. § 1412(a)(1)(A). A FAPE consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such related services as are necessary to permit the child to benefit from the instruction. Rowley, 458 U.S. at 188-89. Among other things, "related services" includes psychological services and counseling

13

services as may be required to assist a handicapped child to benefit from special education. 20 U.S.C. § 1401(17). The IDEA does not require the furnishing of every special service necessary to maximize each disabled child's potential. Hartmann v. Loudoun County Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997). However, a school system does not discharge its duty under the IDEA by providing some minimal academic advancement, no matter how trivial. Hall ex rel. Hall v. Vance County Bd. of Educ., 774 F.2d 629, 636 (4th Cir. 1985).

To assure that students with disabilities receive a FAPE, the IDEA requires that school districts provide an IEP for each disabled child. See 20 U.S.C.A. § 1414 (d)(1)(A). An IEP is sufficient if it is reasonably calculated to confer some educational benefit on a disabled child. Rowley, 458 U.S. at 207. If a state receiving IDEA funding fails to provide a FAPE, the child's parent may remove the child to a private school and seek tuition reimbursement from the state. Under what has been denominated the Burlington-Carter framework, a parent may recover tuition reimbursement if: (1) the proposed IEP was inadequate to offer the child a FAPE, and (2) the private education services obtained by the parents were reasonably calculated to enable the child to receive educational benefits. Sch. Comm. v. Dep't of Educ. of Mass., 471 U.S. 359, 369 (1985); Carter v. Florence County Sch. Dist. Four, 950 F.2d 156, 163 (4th Cir. 1991).

Courts should not substitute their own notions of sound educational policy for those of the school authorities that they review. Rowley, 458 U.S. at 206. A reviewing court should defer to the educators' decision as long as an IEP provided the child the basic floor of opportunity that access to special education and related services provide. Tice ex rel. Tice v. Botetourt County Sch. Bd., 908 F.2d 1200, 1207 (4th Cir. 1990). However, the required deference to the opinions of the professional educators does not somehow relieve the hearing officer or district court of the

obligation to determine as a factual matter whether a given IEP is appropriate. County Sch. Bd. v. Z.P. ex rel. R.P., 399 F.3d 298, 307 (4th Cir. 2005). Evidence of actual progress may be relevant to a determination of whether a challenged IEP was reasonably calculated to confer some educational benefit. M.S. ex rel. Simchick v. Fairfax County Sch. Bd., 553 F.3d 315, 327 (4th Cir. 2009). Progress or lack thereof, while important, is not dispositive, but rather a factor in determining educational benefit. Id.

2. LHO's Findings

In reviewing the administrative record, it appears that the LHO supported his conclusion with facts that are not consistent with the record. The LHO referenced the testimony of Ms. Hiatt and Mr. Richards as stating that Montcalm had no problems with D.T. and that he only refused to attend school once while at Montcalm. The LHO attributed this improvement in attendance to the lack of video games available to D.T. at Montcalm as compared to his home environment with Defendant. According to Mr. Richard's testimony, D.T. actually refused to attend classes at Montcalm three times and required therapeutic intervention on several occasions. A.R. 1021, ECF No. 29-17. The LHO found that Defendant failed to ensure D.T.'s attendance at Lexington High School; however, Defendant made consistent efforts to convince D.T. to attend school, including the use of various tactics like punishment and rewards. As the LHO himself notes, Defendant tried taking away D.T.'s games for numerous days, but this strategy failed and led to D.T. not eating or bathing. Furthermore, Ms. Hiatt from Montcalm explained that D.T. was not the type of student who does not want to go to school because he would rather play video games, because once he attended classes, he was successful. A.R. 0050, ECF No. 29-1. Further, the court disagrees with how the LHO framed the central issue. It is not whether it is the parent's or the school's responsibility to ensure

15

attendance, but whether an IEP should address a student's resistance to attending school where it is related to his disability and prevented the student from benefitting from special education. The District agrees that it was part of its responsibilities to address attendance issues. In fact, that is precisely why the District had multiple school officials visit D.T. at home. A.R. 1020, ECF No. 29-17.

The LHO states that "whether or not counseling would have helped is speculative since it did not work in York County." A.R. 1021, ECF No. 29-17. Despite this, the District's failure to even attempt counseling or obtain a psychological evaluation to address the causes of D.T.'s resistance to school is inadequate. The LHO admitted that the District's testimony through Carey indicated that D.T. had anxiety and depression, which are symptoms of Asperger's Disorder; however, the LHO did not hold the District responsible for failing to provide for an evaluation or counseling for D.T. until the second notice of removal was sent to the District by Defendant. The underpinning of the LHO's argument is that D.T.'s failure to attend school was unrelated to Aspberger's Disorder, as he questioned whether D.T. even had Asperger's.

The testimony in the record demonstrates that D.T. has Asperger's Disorder. D.T. was originally diagnosed with Asperger's Disorder by the psychiatric department at the University of South Carolina Medical School. A.R. 0838-0840, 0844, ECF No. 29-13. This diagnosis was confirmed by the Carolinas Rehabilitation Center in 2006. A.R. 0852, ECF No. 29-13. After conducting a psychiatric evaluation of D.T. in December 2007, Dr. Schnackenberg, stated that, in his professional opinion, D.T.'s unresponsive behavior and withdrawal were manifestations of his disability and were not willful maladaptive behaviors. A.R. 0995, ECF No. 29-16. D.T. himself complained various times to school administrators at Lexington High School about feeling

16

uncomfortable in classes and classes being hard.  A.R. 0044, ECF No. 29-1.  Even if the District

questioned whether or not D.T.'s behavior was related to his disability, it failed to conduct a

psychological evaluation to determine whether this was the case.

Considering progress as a factor in determining the adequacy of the IEP, D.T. made no

progress at Lexington High School.  M.S. ex rel. Simchick v. Fairfax County Sch. Bd., 553 F.3d

315, 327 (4th Cir. 2009).  Further, D.T. would not be able to obtain any benefit from the IEP

designed by the District if he refused to attend school altogether.  Rowley, 458 U.S. at 207.  Giving

deference to both the findings of the LHO and SRO and having conducted an independent analysis

of the evidence presented, the court finds that the LHO erred in finding that the District's IEP was

adequate, because the IEP lacked a provision for counseling or a psychiatric evaluation of D.T.

Thus, the court finds that the District failed to provide D.T. with a FAPE during the 2007-2008

school year.

## 3. Deference to the SRO's Findings

The District contends that the SRO is not entitled to any deference because he failed to give

the appropriate deference to the LHO and thus his findings were not "regularly made."  Pl.'s Mot. J.

A.R. 16, ECF No. 24-1.  The court disagrees.

The District argues that the SRO improperly disregarded the credibility-based factual

findings of the LHO without explanation. In particular, the District states that the SRO improperly

relied on Ms. Hiatt of Montcalm, despite the LHO's implicit credibility determination rejecting

Hiatt's testimony that D.T.'s refusal to attend school was related to his disability.  Pl.'s Mot. J. A.R.

19, ECF No. 24-1.  The record does not reflect that any such credibility determination regarding Ms.

Hiatt's testimony was made.  In fact, the LHO considered Ms. Hiatt's testimony on two separate

occasions and made no mention of a credibility issue. A.R. 1018, 1021, ECF No. 29-17. Although the LHO concluded that D.T.'s refusal to attend school was not related to his disability, the SRO was free to weigh the evidence differently, so long as he gave deference to the testimony presented by the LHO. The SRO gave deference to the LHO's findings and considered the District's argument that it was not required to offer services to address behavior issues that it believed were not related to D.T.'s disability. However, the SRO found that the argument was unsupported by evaluative data. A.R. 1060, ECF No. 29-18. The District states that the SRO failed to consider the efforts taken by the District in 2007-2008 to address D.T.'s attendance issues. To the contrary, the SRO stated that "while the level of activity on the part of District increased with each threat by Parent to remove Student, the services provided were not aimed at the root problem as necessary in order for Student to access an education." Id. Further, the SRO found that Ms. Carey visited the home on more than one occasion, but not for the purpose of providing counseling or therapy. The SRO's factual background section included the services that the District provided to address D.T.'s truancy, including the District's creation of a truancy intervention plan, the subsequent IEP meetings, and the visits by school officials. A.R. 1038, 1039, ECF No. 29-18. The SRO gave the appropriate deference to the factual findings of the LHO, but simply weighed the evidence differently and made an independent judgment, which he was entitled to do. Heffernan, 642 F.3d at 478.

Even if this court were to find that the SRO's findings should be accorded no weight because they were not regularly made, the court would still find that the 2007-2008 IEP was inadequate based on an independent evaluation of the facts and a preponderance of the evidence. The court has explained why it has disagreed with the findings of the LHO. The court would have come to its conclusion that the District's IEP for the 2007-2008 school year was inadequate, even if it gave no

deference to the SRO's findings.

4. Appropriateness of Montcalm Placement

The District contends that Montcalm is not a proper placement because D.T. did not require a residential placement in order to receive any educational benefits. Further, it argues that non-educational needs were the basis for the decision to place D.T. in a residential placement and thus reimbursement is not required. Pl.'s Mot. J. A.R. 25-26, ECF No. 24-1.[2]

Under the IDEA, like an IEP, a parental placement, whether residential or not, is appropriate only if it is "reasonably calculated to enable the child to receive educational benefits." Carter, 50 F.2d at 163. In addition to the IEP context, evidence of actual progress is also a relevant factor to a determination of whether a parental placement was reasonably calculated to confer some educational benefit. M.S. ex. rel. Simchick, 553 F.3d at 327. However, a residential placement is appropriate only if the educational benefits that can be provided through residential care are essential for the child to make any educational progress at all. Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 980 (4th Cir. 1990) (where funding for a residential placement was denied because student showed educational progress at the local school). The determination of whether services beyond the regular school day are essential for the child to receive any educational benefit is necessarily fact and case specific. Id. Where medical, social, or emotional problems are intertwined with educational problems, courts recognize that local education agencies must fund residential placements. Id. at 980. On the other hand, if a residential placement is necessitated by medical, social or emotional

---

2 The LHO did not address the appropriateness of the Montcalm placement on the merits. He held that collateral estoppel applied and that a finding from Defendant's previous due process hearing involving a different school district, that Montcalm was not an appropriate placement, was controlling. The SRO found that collateral estoppel was inapplicable. The parties in this case have agreed not to address the issue of collateral estoppel in their cross-motions for judgment on the administrative record. Def.'s Mot. J. A.R. 15, ECF No. 23-1.

problems that are segregable from the learning process, then the local education agencies need not fund the residential placement. Id.

The District points to two unpublished opinions of the Fourth Circuit to support its position that D.T.'s mental health issues were segregable from his educational needs. In Shaw v. West, No. 08-11485, 2010 WL 331428 (4th Cir. Jan. 26, 2010), the Fourth Circuit held that parents of a disabled student were not entitled to reimbursement for a residential treatment facility when the primary reasons for placing their daughter in the facility was for health and safety reasons, because she had frequently exhibited suicidal tendencies. Unlike the student in Shaw, D.T. exhibited no dangers to himself or others; one of the primary reasons for placing D.T. at Montcalm was to find an environment where D.T. would respond to education. A.R. 0835, ECF No. 29-13.

The District argues that D.T.'s placement at Montcalm was triggered by mental concerns arising from his depression and anxiety that were mostly attributable to his father's death, his mother's remarriage, and his family's subsequent relocation. Def.'s Mot. J. A.R. 28, ECF No. 24-1. The administrative record does not support this proposition. The events referred to by the District occurred almost a year before D.T. was placed at Montcalm. Defendant did not place D.T. at Montcalm shortly after these life changing events occurred. To the contrary, Defendant placed D.T. at Montcalm only after he was perpetually truant and unresponsive to her and the District's efforts to educate him at Lexington High School. There is also ample evidence in the record to suggest that the anxiety D.T. experienced in school, while it may have been exacerbated by life events, is a common symptom of Asperger's and was a major cause of his unresponsiveness. A.R. 0845, 0856-0859, 0863, ECF No. 29-13, 14.

The court in <u>Shaw</u> commented that residential reimbursement is appropriate where basic self-help and social skills such as toilet training, dressing, feeding, and communication are lacking. In this case, D.T. possesses basic self-help skills. However, the court in <u>Shaw</u> stated that while a lack of basic self-help skills presents a compelling set of circumstances, a residential placement may be required where a student's medical needs and educational needs are less clearly unitary, as is the case with D.T. No. 08-11485, 2010 WL 331428, at *6 (4th Cir. Jan. 26, 2010).

In <u>Board of Educ.v. Brett Y</u>, No. 97-1936, 1998 WL 390553 (4th Cir. Jan. 26, 1998), the Fourth Circuit held that parents were not entitled to residential placement reimbursement where their son exhibited academic progress at school and was otherwise participating but was having serious mental and behavioral issues at home. The Fourth Circuit reasoned that despite the student's frequent absences, which they attributed to his behavioral issues at home, the student was capable of being educated at school and thus, his mental and behavioral issues were segregable from his educational problems.

Unlike the student in <u>Brett Y</u>, who was extremely angry in the home but not in school, D.T. exhibited the same non-aggressive behavioral issues at home as he did in school; frequently being unresponsive to any attempt to educate him. Furthermore, unlike the student in <u>Brett Y</u>, whose school attendance had improved at different points and who had shown academic improvement, D.T. exhibited no such progress. Throughout the fall of 2007, the District and Defendant had a difficult time getting D.T. to respond to any educational environment. The evidence above shows that D.T.'s Asperger's symptoms, including anxiety and frustration, were often accompanied by the educational problems he was having at Lexington High School. Thus, the court agrees with the SRO's finding that D.T.'s mental needs were not segregable from his educational needs during the point at which

21

Defendant placed him at Montcalm.  As such, the court agrees with the SRO's determination that a residential placement was essential for D.T. to make any educational progress.

The District argues that the findings of the SRO concerning the appropriateness of Montcalm were not regularly made and therefore are not entitled to deference by the court.  The District contends that the SRO incorrectly supported his contention that D.T.'s mental issues were not segregable from the learning progress using evidence of progress made at Montcalm.  The court disagrees.  In the SRO's opinion, he states that counseling support at Montcalm was essential to getting D.T. to open up and deal with issues that had previously made him essentially "unteachable." A.R. 1063, ECF No. 29-17.  Thus, the SRO's determination that D.T.'s psychological issues were not segregable from the learning progress was not based solely on progress at Montcalm but on the fact this D.T.'s condition, including his symptoms of anxiety in school, had caused him to be unresponsive to a point where no one was able to educate him at Lexington High School.  The SRO's finding is entitled to deference by the district court, noting that the LHO did not consider this issue on the merits.  However, even assuming that the SRO's findings were entitled to no weight, based on the independent analysis of the evidence as set forth above, this court would still find that a residential placement for D.T. was appropriate during the 2006-2007 school year and that Montcalm is otherwise an appropriate parental placement under the IDEA.

The court finds no error with the SRO's conclusion that with both prongs of the Carter-Burlington test fulfilled, Defendant is entitled to a full reimbursement of the tuition costs from Montcalm for the 2007-2008 school year.

**B.** *Reimbursement for Glenforest Placement; 2008-present*

1. <u>IEP and FAPE</u>

Defendant contends that the LHO and SRO erred in failing to find that she was entitled to reimbursement for tuition paid to Glenforest from 2008 to present.  Specifically, Defendant argues that the IEP designed by the District for the 2008-2009 school year and the subsequent IEPs were inadequate because they included virtual school and lengthy classes that would likely cause D.T. to regress academically and socially.

Here, the revised IEP included ninety minutes per day for direct special education services, assistive technology, an Autism specialist on a consultant basis, and blocks of the day split between a motivational activity, virtual school, regular curricular classes, and social skills class.  The only evidence that the District had regarding the inadequacy of virtual classes was from Montcalm.  Prior to the Defendant's placement of D.T. at Montcalm, she had even requested virtual classes for D.T.  Regardless, the District was willing to obtain a professional evaluation of D.T. to determine whether virtual classes were adequate.

Although the IEP did not include counseling, the IEP did not have to include counseling at this juncture in order to be adequate.  D.T.'s condition had improved significantly before the 2008-2009 school year, and he was doing much better academically than he had been the year before.  Furthermore, the District was willing to provide counseling for D.T. upon the recommendation of a psychologist or outside agency.  Defendant was not satisfied with the District's IEP and provided notice of D.T.'s unilateral placement at Glenforest effective September 8, 2008 and requested reimbursement for the costs.  The District issued a notice refusing to agree, but proposed an evaluation and counseling by a psychologist from an outside agency.  Despite this offer, Defendant

placed D.T. at Glenforest School and has not removed him since. The IEP team reconvened for the 2009-2010 school year, in virtually the same situation it had been in a year prior, but at this point, Defendant had already paid tuition to Glenforest School and D.T. remained there. The court agrees with the LHO and SRO's finding that the IEP designed for the 2008-2009 school year and the subsequent years was adequate and that D.T. would have received a FAPE had he attended Lexington High School. The court need not address the appropriateness of the Glenforest placement, because there is no evidence that the District has failed to provide a FAPE. Therefore, the court finds no error in the LHO and SRO's determination that Defendant is not entitled to reimbursement for any tuition she has paid to Glenforest.

With regard to the Defendant's request for judgment as to all future reimbursements for placement at Glenforest School, the District's future IEPs can change as can its provision of a FAPE from year to year. The court declines to make any judgment with regard to future provisions of a FAPE and future reimbursements for parental placements.

### III. Conclusion

The Court partially grants both the Plaintiff's and Defendant's motions for judgment on the administrative record. The court affirms the SRO's determination that while the Defendant is entitled to reimbursement for tuition paid to Montcalm for the 2007-2008 school year, she is not entitled to any tuition paid to Glenforest School from 2008 to present.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
The Honorable Margaret B. Seymour
United States District Judge

September 22, 2011
Columbia, South Carolina